DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Erie County Court of Common Pleas, convicting appellant on four offenses related to an alleged plan to purchase cocaine. Because we conclude that the initial stop of appellant's vehicle was improper, we reverse.
{¶ 2} Appellant, James Michael Young, was indicted as follows: Count One: complicity to commit possession of cocaine, a violation of R.C.2923.03(A)(3); Count Two: complicity to commit preparation of cocaine for sale, a violation of R.C. 2923.03(A)(3); and Counts Three and Four: possession of criminal tools, violations of R.C. 2923.24(A). The indictment stemmed from the police stop and subsequent search of a vehicle in which appellant as a passenger. Appellant pled not guilty to all counts and filed a motion to suppress the evidence obtained.
{¶ 3} At a hearing on the motion to suppress, the following facts relevant to this appeal were presented. Officer Curt Muehling, commander of investigations conducted by the Erie County Drug Task Force ("ECDTF"), testified that in March 2002 he received information from federal agents that appellant had agreed to purchase cocaine from a federally indicted defendant, Quinn Nettles. In cooperation with the federal agents, Nettles had set up the deal to take place in Cleveland on April 26, 2002. Appellant was to be driving a tan or cream colored Q45 Infinity, a vehicle that Muehling knew appellant owned. Muehling set up a surveillance of appellant's residence in Sandusky, Ohio. Appellant did not go to Cleveland that day, however, allegedly because he recognized some of the police surveillance vehicles.
{¶ 4} A second deal was allegedly arranged to occur on July 30, 2002 with appellant leaving from his residence at 2:00 p.m. to travel to Cleveland. The ECDTF again set up surveillance. Muehling observed a previously convicted drug dealer enter the home and then leave. Appellant's brother also came out of the house, checked the mail and talked on a cell phone. Muehling stated that appellant's brother had previously done a "controlled buy" at this house for police. Muehling also saw appellant's mother leave the house with "somebody."
{¶ 5} At 1:56 p.m., Muehling testified that appellant left the residence, placed "something" in the trunk of a red Cadillac, and got into the car which his girlfriend was driving. Initially Muehling called the item a "box," but ultimately acknowledged that at the time this item was placed in the trunk, he did not have a good view. He could only say in his report that appellant had something in his hand which he placed in the trunk. The vehicle traveled east on a local road to a Marathon gas station, where they purchased fuel. The surveillance team then followed the vehicle which continued east toward the city of Huron. The car then turned onto Rye Beach Road/Route 6, ultimately arriving at the entrance ramp to the State Route 2 bypass. Muehling had previously notified the Huron Police Department which had stationed two marked cruisers near the bypass ramp. The vehicle did not stay on State Route 2, however, but shortly exited onto Route 6 toward Huron. At this point, the Huron officers who had been following the Cadillac, stopped the car and ECDTF officers arrested both appellant and his girlfriend for conspiracy to possess cocaine. Police then conducted a search of the vehicle and took the defendants to the Huron Police Department where the two defendants were briefly interviewed.
{¶ 6} A search warrant was then prepared and, approximately one hour after the arrest, ECDTF officers conducted a search of appellant's home in Sandusky. Appellant was brought to the home and talked to another officer while Muehling and others searched the premises.
{¶ 7} Muehling acknowledged that regardless of which vehicle he was in, if appellant left his home on April 26, 2002, the original "buy" day, and traveled east, the police would have arrested him. Muehling also stated that as a result of the search of the vehicle, the police found a box in a shopping bag. The box contained money and a set of scales. He acknowledged, however, that he could not tell whether the box with the money was the same item that he saw appellant place in the trunk.
{¶ 8} Another Task Force officer, Vincent Donald, testified that he was one of the surveillance officers. He stated that he was involved in the search of the trunk which contained $24,000, a scale, and plastic "baggies." He said the money was in a box which was in a shopping bag with handles. He stated that he did not see any of appellant's actions at the residence, but acted solely on the basis of information passed on to him by Muehling by radio or cell phone. Donald noted that the vehicle used, anything placed in the trunk, or whether he was driving was of no relevance to the intent to arrest him. He acknowledged that regardless of any other factors, the plan was that if appellant left his residence that day and traveled east, the vehicle he was in was going to be stopped and he would be arrested.
{¶ 9} A third Task Force officer, Gregory Majoy, also testified as one of the surveillance team located on Rye Beach Road. He agreed that State Route 2 was a quicker route than Route 6 if traveling to Cleveland, and that appellant's vehicle had turned off of Route 2. He also admitted that, regardless of which route appellant's vehicle took, as long as he was traveling east, the Huron police would have been instructed to stop and arrest him.
{¶ 10} The trial court denied the motion to suppress generally, but withheld its ruling concerning the suppression of certain statements made by appellant to police after his arrest. A trial to the bench was conducted. At the end of trial, the court granted appellant's motion to suppress statements made to Officer Muehling, but found appellant guilty on all four counts. Appellant was sentenced to prison terms of five years each on Counts One and Two and ten months on each of the remaining two counts, with the terms to run concurrently.
{¶ 11} Appellant now appeals from that judgment, arguing the following four assignments of error:
{¶ 12} "I. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S PRE-TRIAL MOTION TO SUPPRESS ALL EVIDENCE.
{¶ 13} "II. THE TRIAL COURT ERRED WHEN IT FAILED TO RULE ON APPELLANT'S MOTION TO SUPPRESS EVIDENCE OF STATEMENTS MADE TO OFFICER MUEHLING UNTIL THE END OF APPELLANT'S TRIAL.
{¶ 14} "III. THE TRIAL COURT ERRED WHEN IT RULED QUINN NETTLES, A MATERIAL WITNESS TO THE STATE'S CASE AGAINST APPELLANT, WAS UNAVAILABLE.
{¶ 15} "IV. THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF PURPOSE."
{¶ 16} In his first assignment of error, appellant asserts, in essence, that the trial court should have granted his motion to suppress all evidence obtained as a result of the stop of his vehicle and dismissed the charges because the police did not have probable cause to stop his vehicle and arrest him. We agree.
{¶ 17} An appellate court's review of a ruling on a motion to suppress evidence presents a mixed question of law and fact. State v. Long
(1998), 127 Ohio App.3d 328, 332. During a suppression hearing, the trial court assumes the role of the trier of fact and is, therefore, in the best position to resolve factual questions and evaluate the credibility of witnesses. State v. Mills (1992), 62 Ohio St.3d 357, 366;State v. Hopfer (1996), 112 Ohio App.3d 521, 548. As a result, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Guysinger (1993),86 Ohio App.3d 592, 594. An appellate court must independently determine, without deference to the trial court's legal conclusions, whether, as a matter of law, the facts meet the applicable standards.State v. Russell (1998), 127 Ohio App.3d 414, 416; State v. Klein
(1991), 73 Ohio App.3d 486, 488.
{¶ 18} The Fourth Amendment to the United States Constitution prohibits warrantless searches and seizures, rendering them per se unreasonable unless an exception applies. Katz v. United States (1967),389 U.S. 347. Section 14, Article I of the Ohio Constitution contains language nearly identical to that of the Fourth Amendment, "and its protections are coextensive with its federal counterpart." State v.Kinney (1998), 83 Ohio St.3d 85, 87. Excluding evidence obtained in violation of these constitutional protections is a vital part of the guarantee against unlawful searches and seizures. See Mapp v. Ohio
(1961), 367 U.S. 643, 648.
{¶ 19} An investigative stop, or Terry stop, is a common exception to the Fourth Amendment warrant requirement. See Terry v. Ohio (1968),392 U.S. 1. In order for such a stop to be constitutionally permissible, the officer's level of suspicion does not have to be as great as is necessary to support a finding of probable cause; instead, the officer must have only a "reasonable suspicion of criminal behavior based on specific and articulable facts." State v. Miller (1997),117 Ohio App.3d 750, 756-57. Thus, a police officer, with reasonable suspicion of criminal activity based on articulable facts, may stop a vehicle and detain its occupants briefly for purposes of limited questioning. State v. Norman (1999), 136 Ohio App.3d 46, 53; Statev. Terry (1998), 130 Ohio App.3d 253, 257. Nonetheless, a valid investigative stop must be based upon more than a mere "hunch" that criminal activity is afoot. United States v. Arvizu (2002), 534 U.S. 266,274; Illinois v. Wardlow (2000), 528 U.S. 119, 124; Terry, 392 U.S. at 27.
{¶ 20} When a vehicle is stopped for the purpose of effecting an immediate, warrantless arrest, however, police must have probable cause for the stop and the arrest. Probable cause exists when a reasonable, prudent person would believe that the person arrested had committed a crime. See State v. Timson (1974), 38 Ohio St.2d 122, 127. In determining whether probable cause to arrest exists, the totality of the facts and circumstances must be "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Beck v.Ohio (1964), 379 U.S. 89, 91; State v. Tibbetts (2001), 92 Ohio St.3d 146,153. See, also, Carroll v. United States (1924), 267 U.S. 132, 162 (facts and circumstances within a police officer's knowledge from reasonably trustworthy information must be sufficient in themselves to warrant a man of reasonable caution to believe that criminal conduct is afoot.) Probable cause generally focuses on the actions of the accused just prior to the arrest. State v. Papadopulos (Oct. 4, 2004), 5th Dist. No. 2004CA00069. Factors which may be considered include an officer's observation of some criminal behavior by the defendant, furtive or suspicious behavior, flight, events escalating reasonable suspicion into probable cause, or association with criminals and their locations. Id.
{¶ 21} A warrantless arrest done without probable cause is unconstitutional. State v. Timson (1974), 38 Ohio St.2d 122, paragraph one of the syllabus. Likewise, any search incident to that arrest is unconstitutional, and any primary or derivative evidence obtained subsequent to and as a result of the illegal arrest and search becomes "fruit of the poisonous tree" and must be suppressed. Id. at paragraph two of the syllabus. See, also, Segura v. United States (1984),468 U.S. 796, 804; Nardone v. United States (1939), 308 U.S. 338, 341. Statements made after a defendant is illegally arrested must also be suppressed as "fruit of the poisonous tree," even if the defendant was Mirandized. See Wong Sun v. United States (1963), 371 U.S. 471, 488. If, after being arrested, a defendant asserts that probable cause was lacking at the time of arrest, the state bears the burden of proof on the issue of whether probable cause existed for a subsequent search and seizure.Xenia v. Wallace (1988), 37 Ohio St.3d 216, paragraph two of the syllabus.
{¶ 22} In this case, contrary to the state's suggestion, the purpose for pulling over the Cadillac was not to conduct a brief investigatory stop. Rather, the police stopped the Cadillac for the sole and immediate purpose of arresting appellant. Consequently, the applicable standard to the vehicle stop and appellant's subsequent arrest is that of "probable cause," not the less stringent Terry stop standard, a "reasonable, articulable suspicion."
{¶ 23} The record in this case reveals that the only facts and circumstances known to police regarding a belief that "criminal conduct was afoot" was the "tip" from the federally indicted Nettles as relayed by the DEA agent. Although that information may have alerted the police to the potential for criminal activity, justifying the surveillance of appellant, there was no actual evidence of any criminal activity at the time of his arrest which reasonably indicated that appellant was about to commit any criminal acts. The acts of placing an unidentified item in the trunk of an automobile, purchasing gas for the vehicle, and merely traveling in the general direction of Cleveland may indeed have been consistent with accomplishing the purported deal to purchase cocaine in Cleveland. These actions are, however, equally consistent with innocent behavior, such as traveling to a restaurant or store, visiting a friend, or simply "joy riding." Even when all three acts are considered together, there is nothing "overt" or "suspicious" to demonstrate that appellant was engaging in any criminal activity. Moreover, the police admitted that appellant's behavior leading up to the arrest was irrelevant. The primary action which activated the stop and arrest was only appellant's eastward movement.
{¶ 24} Despite the "tip" information, without something more to indicate criminal activity, appellant's actions were insufficient to establish probable cause to justify the stop and arrest. Although appellant may, indeed, have been on his way to complete the deal to purchase cocaine, in this case, the police acted prematurely and in violation of the United States and Ohio Constitutions. As a result, the stop was illegal, appellant's arrest was illegal, and any evidence obtained subsequent to the arrest is tainted. Therefore, the trial court erred in denying appellant's motion to suppress all evidence obtained as a result of the arrest and search, and appellant's convictions must be vacated.
{¶ 25} Accordingly, appellant's first assignment of error is well-taken. Appellant's remaining assignments of error are moot.
{¶ 26} The judgment of the Erie County Court of Common Pleas is reversed, appellant's convictions and sentences are vacated. Appellee is ordered to pay the costs of this appeal for which sum judgment is rendered against appellee on behalf of Erie County and for which execution is awarded. See App.R. 24.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J., Singer, P.J., Parish, J., Concur.